## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| John F. Zaffino, | : | Case No. 5:05CV1485 |
| | : | |
| Petitioner | : | Judge Peter C. Economus |
| | : | |
| v. | : | Magistrate Judge David S. Perelman |
| | : | |
| Khelleh Konteh, Warden, | : | **REPORT AND RECOMMENDED** |
| | : | **DECISION** |
| Respondent | : | |

In this action in habeas corpus, 28 U.S.C. §2254, petitioner challenges the constitutionality of his March 13, 2003 conviction pursuant to a jury trial of one count of aggravated murder with a firearm specification, upon which he is currently serving a sentence of life imprisonment for aggravated murder and three years incarceration on the firearm specification, to be served consecutively.

Petitioner's conviction arose consequent to a love triangle, which culminated with Mr. Jeff Zack being fatally shot in the face.

Petitioner appealed his convictions to the Ohio Ninth District Court of Appeals alleging five assignments of error:

> 1. Appellant's due process rights and right to equal protection under the laws were violated when he was denied a preliminary hearing as a result of Summit County's direct indictment program in violation of the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 16 and Section 2 of the Ohio Constitution and in violation of Criminal

1

Rule 5 and O.R.C. 2945.73(A).

2. Appellant was denied his due process and confrontational rights as secured by Article I, Section 10 of the Ohio Constitution and the Fifth Amendment to the United States Constitution, when the State called a witness to the stand and the court excused the witness after the witness invoked her privilege against self-incrimination.

3. The evidence in this case was insufficient as a matter of law to support a conviction of aggravated murder and as a result the appellant's rights as protected by Article I, Section 16 of the Ohio Constitution and Fifth Amendment of the United States Constitution were violated.

4. The verdict in this case was against the manifest weight of evidence; appellant's rights as secured by Article I, Section 16 of the Ohio Constitution and the Fifth Amendment of the United States Constitution were violated.

5. The trial court violated appellant's Fifth and Sixth Amendment rights as guaranteed by the United [States] Constitution in overruling appellant's pretrial motion to suppress post arrest statements of appellant.

On December 31, 2003 the state appellate court affirmed the judgment of conviction and sentences.

Petitioner, represented by the same appellate counsel, filed with the Ohio Supreme Court an appeal of the affirmance of his convictions, in which he alleged propositions of law paralleling those raised in the lower appellate court. On May 26, 2004 the court denied petitioner leave to appeal and dismissed the appeal as not involving any substantial constitutional question. Petitioner did not appeal this decision to the United States Supreme Court.

On May 25, 2005, through new counsel, the petitioner filed the instant petition in which he raised the following three claims for relief:

A. **GROUND ONE:** Violations of defendant's [sic] Fifth and Fourteenth Amendment rights of due process and equal protection.

2

**Supporting FACTS:** The defendant-petitioner [sic] was denied a preliminary hearing within the time mandated by Ohio statute and rules of criminal procedure. Further, petitioner was subjected to the direct indictment program while others similarly situated are/were not which constitutes a violation of his equal protection rights.

**B.   GROUND TWO:** Violations of defendant's [sic] Fifth and Fourteenth Amendment rights against self-incrimination and right to counsel.

**Supporting FACTS:** The defendant [sic] requested that counsel be present during his custodial interrogation. The request was ignored and the interrogation continued.

**C.   GROUND THREE:** The evidence produced at trial was insufficient to support the conviction.

**Supporting FACTS:** The evidence produced by the State of Ohio was insufficient and failed to prove each element of the alleged crime.

On June 1, 2006, after numerous extensions of time, petitioner, acting through counsel, filed a brief in response to the return of writ which included the following additional claim for relief:

**D.   GROUND FOUR:** The writ should be granted as the petitioner, Mr. Zaffino, received ineffective assistance of counsel throughout the trial and state appellate process.

The provisions of the Antiterrorism and Effective Death Penalty Act, "AEDPA," Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 26, 1996) are controlling herein as the instant petition was filed after the Act's effective date.  Lindh v. Murphy, 521 U.S. 320 (1997).[1]

The role of a federal district court in habeas corpus is set forth in Title 28 U.S.C. § 2254 (d) which provides:

------

[1]There are no issues of untimeliness in this case.

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The United States Supreme Court has held that the clauses "contrary to" and "unreasonable application of" as found in §2254(d)(1) have independent meanings. Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495 (2000). A state court adjudication is deemed as being "contrary to" Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [that of the Supreme Court]." A state court adjudication is deemed as involving an "unreasonable application of clearly established Federal law, as determined by the Supreme Court...as of the time of the relevant state-court decision;" "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," or "if the state court either unreasonably extends a legal principal from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principal to a new context where it should apply." 120 S.Ct. at 1519-1520. In deciphering the "unreasonable application" clause this Court must inquire as to whether "the state court's application of clearly established federal law was objectively unreasonable." Id. at 1521.

4

The Sixth Circuit Court of Appeals has interpreted the foregoing as holding that even if a federal habeas corpus court determines that a state court incorrectly applied federal law it may not grant relief in habeas corpus unless it finds that the state court ruling was also unreasonable. Simpson v. Jones, 238 F.3d 399, 405 (6th Cir. 2000), citing Machacek v. Hofbauer, 213 F.3d 947, 953 (6th Cir. 2000), cert. denied, 121 S.Ct. 808 (2001).

In his first claim for relief petitioner challenges as unconstitutional the trial court's failure to provide him with a preliminary hearing prior to indicting him.

To be entitled to relief in federal habeas corpus a petitioner must establish that there has been infringement of a right guaranteed under the United States Constitution. Clemmons v. Sowders, 34 F.3d 352, 357 (6th Cir. 1994). A violation of state law is not cognizable in federal habeas corpus unless such error amounts to a fundamental miscarriage of justice or a violation of the right to due process in violation of the United States Constitution. See, Floyd v. Alexander, 148 F.3d 615, 619 (6th Cir.), cert. denied, 525 U.S. 1025 (1998); Serra v. Michigan Dep't of Corrections, 4 F.3d 1348, 1354 (6th Cir. 1993), cert. denied, 510 U.S. 1201 (1994). It is the obligation of this Court to accept as valid a state court's interpretation of the statutes and rules of practice of that state. Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). Accord, Duffel v. Dutton, 785 F.2d 131, 133 (6th Cir. 1986).

On direct appeal the state appellate court addressed this claim purely as a matter of state law, and held:

> Upon review, we conclude that while Crim.R. 5(B) and R.C. 2945.73 prescribe that a preliminary hearing shall be held within a designated time period, the failure to provide a preliminary hearing within the specified time periods does not automatically entitle a defendant a dismissal of the charges against him.
>
> At the outset, we note that the purpose of a preliminary hearing is not to determine guilt or innocence. *White v. Maxwell* (1963), 174 Ohio

5

St. 186, 188, 187 N.E.2d 878, certiorari denied, 375 U.S. 880, 11 L.Ed.2d 112, 84 S.Ct. 151.  Rather, "the only purpose of a preliminary hearing is to determine whether sufficient facts exist to warrant the court in binding the accused over to the grand jury[.]" *State v. Wigglesworth* (1969), 18 Ohio St.2d 171, 248 N.E.2d 607, paragraph one of the syllabus; see, also, *State v. Morris* (1975), 42 Ohio St.2d 307, 325-26, 329 N.E.2d 85.  Consequently, "once an indictment has been returned by the grand jury, a preliminary hearing before a magistrate is no longer necessary." *Wigglesworth*, 18 Ohio St.2d 171, 248 N.E.2d 607, paragraph one of the syllabus.

* * * * *

Therefore, if an indictment is handed down before a timely and proper action is taken to secure a dismissal, the right to a preliminary hearing is extinguished. *[State v.] Wood,* [(1976)] 48 Ohio App.2d [339,] at 342, citing *State ex rel. Haynes v. Powers* (1969), 20 Ohio St.2d 46, 254 N.E.2d 19.  "Neither Ohio law nor the Ohio Constitution require a preliminary hearing nor confer a right upon an accused to a preliminary hearing where he has been indicted by the Grand Jury." *State v. Azcuy* (May 26, 1994) 10th Dist. No. 88AP-529, 1994 Ohio App. LEXIS 2303.  Accord *State v. Tipler* (Feb. 16, 2000), 2000 Ohio App. LEXIS 526, 9th Dist. No. 19344, at *13.  The Ohio Supreme Court has indicated that no rights or defenses are lost for failure to have a preliminary hearing. *White,* 174 Ohio St. At 188.

Second, the indictment that was subsequently issued in this case is a valid charging document.  An otherwise valid indictment need not be dismissed merely because it was returned after the time limits imposed on a preliminary hearing.  *State v. Parker* (Sept. 2, 1980), 10th Dist. Nos. 80AP-67 and 80 AP-68, 1980 Ohio App. LEXIS 12651....

* * * * *

In this case, Appellant did not bring a motion to dismiss in the municipal court at all, and he did not file a motion to dismiss in the common pleas court before the grand jury returned the indictment against him.  Instead, Appellant filed a motion to dismiss based on Crim.R. 5 and R.C. 2945.73(A) in the common pleas court two months after the indictment was returned, and did not assert equal protection as a basis for such motion until four months after the indictment was issued and on the eve of trial.  Such motions are not "timely or proper" actions to obtain an dismissal for lack of a

> preliminary hearing. *Wood,* 48 Ohio App.2d at 342. Appellant was properly indicted by the grand jury before any steps were taken by him to secure a dismissal of the charges against him. Consequently, the right to a preliminary hearing was extinguished.

(Footnotes omitted.)

These allegations of violation of state law fail to rise to the level of a denial of fundamental fairness and, therefore, are not cognizable in federal habeas corpus. However, if they were to be considered, this Court would not find that the decision of the state appellate court was either objectively unreasonable or that it involved an unreasonable application of federal law. Consequently, petitioner's first claim for relief must fail.

In his second claim for relief petitioner challenges the failure on the part of police officers to grant his request to have counsel present during interrogation, which in turn resulted in his having made statements which the trial court refused to suppress.

An individual in police custody must be warned prior to interrogation of his or her right to remain silent, that if statements are made they may be used against him or her, and that he or she has the right to counsel, either appointed or retained, so as to protect the individual's privilege against self-incrimination as guaranteed by the Fifth Amendment of the United States Constitution. Miranda v. Arizona, 384 U.S. 436, 478-79 (1966). Accord, Dickerson v. United States, 530 U.S. 428, 435 (2000).

The United States Supreme Court has held that law enforcement officers must immediately cease questioning a suspect who has clearly asserted his right to have counsel present during custodial interrogation until such time as the defendant reinitiates communication or counsel is made available. Edwards v. Arizona, 451 U.S. 477, 484 (1981).

In Davis v. United States, 512 U.S. 452 (1994), the Supreme Court addressed the ramifications of an ambiguous reference to counsel by the subject of custodial interrogation and

7

held: "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." Id. at 459.  However, if there has been a "knowing and voluntary waiver of the Miranda rights, [then] law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney." Ibid.

When considering the constitutionality of a state court ruling on a motion to suppress premised upon an alleged deprivation of petitioner's right to counsel, a federal habeas corpus court must consider whether the state court's ruling on the issue was an unreasonable application of Supreme Court precedent.  Machacek v. Hofbauer, 213 F.3d 947, 953 (6th Cir. 2000).

In the present case the state appellate court rejected petitioner's allegation that the trial court improperly denied his motion to suppress, holding in pertinent part:

> On December 13, 2002, Appellant filed a motion to suppress statements made to police officers following his arrest.  In his motion, Appellant conceded that he was advised of his *Miranda* rights and stated that his attorney recommended he not talk to detectives, but proceeded to answer questions, upon being assured that he could stop at any time and contact his attorney.
>
> The trial court found that the full and complete Miranda warnings were given to Appellant, that Appellant knowingly, intelligently, and voluntarily waived his rights, and that he agreed to speak with two Akron police officers.  During the course of the interrogation, Appellant indicated that he wanted to stop the interview and speak with an attorney.  The trial court found that the interview ceased immediately and, therefore, denied the motion to suppress.
>
> On appeal, Appellant has claimed that "he made a statement that could reasonably be construed to be an expression of his desire for the assistance of an attorney and that cessation of questioning was required."  However, Appellant has not provided the precise language of what that statement may have been.  See App.R. 16(D).

8

A suppression hearing was conducted and a transcript of the suppression hearing is included in the record.  The sole witness at the hearing was Detective Vincent Felber.

The record of the suppression hearing indicates the following.  Appellant was arrested at 3:30 p.m. on September 25, 2002.  Detective Felber and Lieutenant David Whiddon met with Appellant at 4:20 p.m. and the interview was concluded at 5:10 p.m. – within two hours of the arrest.  Lieutenant Whiddon took notes of the interview; no tape recording was made.  At the time of the interview, the officers were aware that Appellant was represented by Attorney Lawrence Whitney.

The police officers first indicated that they wished to ask Appellant questions about the Zack murder and they then read him his *Miranda* rights.  Appellant stated that he understood those rights, and wished to talk to the police officers.  Appellant indicated that he had spoken with his attorney earlier in the day and told him that he wanted to talk to the police.  The police officers asked whether Appellant was trying to tell them that he wanted to talk to his attorney.  Appellant indicated that he did not, and he would answer their questions.  Appellant took his attorney's business card out of his pocket and laid it on the table.  Detective Felber asked whether he was bringing the card out because he wanted to talk to his attorney.  According to Detective Felber, Appellant said, "This is my attorney.  I just want you to know who he is."  Detective Felber again asked whether Appellant wanted to talk to his attorney and Appellant indicated that he did not.

The officers proceeded to question Appellant about Cindy George, and Appellant answered their questions.  He denied having much of a relationship with Cindy George.  Appellant then indicated that his attorney advised him that he should account for his whereabouts at the time of the murder.  He therefore stated that he was at a friend's house and a car show in Massillon, Ohio at the time of the homicide.  The officers continued by asking Appellant more questions about Cindy George.  Appellant described her as someone with whom he rode bikes.  Appellant also stated that Cindy George advised him not to talk to the police without legal representation.  The police then questioned Appellant about Jeff Zack and again about Cindy George.  He denied knowing Zack or knowing anything about Zack and Cindy George having a relationship.  No mention of Appellant's attorney was made in that discussion.

Finally, the officers asked whether Appellant ever owned a motorcycle, what kind of motorcycle, and whether he still owned one.  Appellant answered that he had owned many motorcycles and still

9

owned a Honda.  Appellant then indicated that he wanted to talk to his attorney, because he felt "we had one up on him."  The police officers immediately stopped questioning Appellant, and they left the room.

In *Davis v. United States* (1994), 512 U.S. 452, 461, 129 L.Ed.2d 362, 114 S.Ct. 2350 the United States Supreme Court held that "after a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney."  It is not sufficient for a suspect to indicate that he *might* want a lawyer.  *Davis*, 512 U.S. at 459.  For example, statements such as, "I think I need a lawyer," "Maybe I should talk to a lawyer," and "I think that I would like an attorney" have been deemed too ambiguous to invoke the *Miranda*  right to counsel.  See *State v. Henness* (1997), 79 Ohio St.3d 53, 63, 1997 Ohio 405, 679 N.E.2d 686; *Davis*, 512 U.S. at 462; *State v. Taylor* (Feb. 9, 1999), 1999 Ohio App. LEXIS 397, 9th Dist. No. 2783-M, at *6.

Moreover, in the present case, there is no evidence that Appellant in any manner actually requested to speak to his attorney; rather, he merely referred to his attorney.  Police officers are not obliged to cease questioning a suspect merely upon "the making of an ambiguous or equivocal *reference* to an attorney."    (Emphasis added.)  *Davis*, 512 U.S. at 459; see, also, *State v. Williams*, 99 Ohio St.3d 439, 2003 Ohio 4164, 793 N.E.2d 446, P33-34.  (Shouting an attorney's name and complaining about the police chasing an attorney away do not constitute an unequivocal request to see counsel.)    Instead, the suspect must unambiguously and unequivocally request counsel.  *Davis*, 512 U.S. at 459.

* * * * *

Appellant admits that he was advised of his *Miranda* rights, that he had an attorney, and that he had recently spoken with him.  The court below found that Appellant made a knowing, intelligent, and voluntary waiver of his *Miranda* rights and agreed to speak to Detective Felber and Lieutenant Whiddon.  The court also found that when Appellant subsequently indicated that he wanted to talk to an attorney, the statement ceased immediately.  The trial court therefore overruled the motion to suppress.  We see no reason to disturb that finding.  None of Appellant's references to his attorney were an unequivocal and unambiguous request to speak to counsel.  Consequently, the trial court did not err in refusing to suppress

10

Appellant's statement to the police officers.   Appellant's fifth assignment of error is not well taken.

Applying the foregoing to the facts of the present case, the state appellate court's ruling that petitioner's constitutional rights were not violated was objectively reasonable, particularly in light of the fact that during his initial conversation with the officers petitioner failed to unequivocally and unambiguously request counsel, and when he subsequently did make such a request they immediately stopped questioning him.  As a consequence, the state court's ruling was neither objectively unreasonable, nor was it an unreasonable application of Supreme Court precedent.  It follows that petitioner's second claim for relief is without merit.

In his third claim for relief petitioner challenges the sufficiency of the evidence relied upon to convict him.

The standard for addressing an argument that a conviction is not supported by sufficient evidence was enunciated in Jackson v. Virginia, 443 U.S. 307, 319 (1979), as follows: "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Accord, McKenzie v. Smith, 326 F.3d 721, 727 (6th Cir. 2003); Matthews v. Abramajtys, 319 F.3d 780, 788 (6th Cir. 2003).  In reaching its determination as to the sufficiency of the evidence this Court may not substitute its determination of guilt for that of the factfinder and may not weigh the credibility of the witnesses.  Herrera v. Collins, 506 U.S. 390, 401-402 (1993);  Jackson v. Virginia, 443 U.S. at 319, n.13; Brown v. Davis, 752 F.2d 1142 (6th Cir. 1985).

That standard has been modified somewhat by §2254(d) in that questions of sufficiency of the evidence are mixed questions of law and fact upon which a writ may be granted only if the adjudication of the state court "resulted in a decision that was contrary to, or involved an

11

unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," §2254(d)(1), or was based upon "an unreasonable determination of the facts in light of the evidence presented" at petitioner's trial, §2254(d)(2).  Starr v. Mitchell, unreported, Case No. 98-4541, 2000 U.S.App. LEXIS 25646,*9-*10 (6th Cir. October 6, 2000).

The state appellate court reviewed petitioner's claims that he was convicted without sufficient proof and held in pertinent part as follows:

> Crim.R. 29(A ) provides that a trial court "shall order the entry of a judgment of acquittal *** if the evidence is insufficient to sustain a conviction of such offense or offenses." The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt. *State v. Jenks* (1991 ), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following *Jackson v. Virginia* (1979 ), 443 U.S. 307, 61 L. Ed. 2d 560, 99 S. Ct. 2781. A reviewing court will not overturn convictions on sufficiency of evidence claims unless reasonable minds could not reach the conclusion reached by the trier of fact. See *State v. Tibbetts* (2001 ), 92 Ohio St.3d 146, 162, 2001 Ohio 132, 749 N.E.2d 226.

> "While the test for sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest weight challenge questions whether the state has met its burden of persuasion." *State v. Gulley* (Mar. 15, 2000 ), 2000 Ohio App. LEXIS 969, 9th Dist. No. 19600, at *4, citing *State v. Thompkins*, 78 Ohio St.3d 380, 390, 1997 Ohio 52, 678 N.E.2d 541 (Cook, J. concurring). When a defendant asserts that his conviction is against the manifest weight of the evidence, "an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Otten* (1986 ), 33 Ohio App.3d 339, 340, 515 N.E.2d 1009.

> This discretionary power should be invoked only in extraordinary circumstances when the evidence presented weighs heavily in favor of the defendant. Id.

In reviewing sufficiency of the evidence and weight of the evidence claims, this Court will consider that the elements of an offense may be established by direct evidence, circumstantial evidence, or both. See *State v. Durr* (1991 ), 58 Ohio St.3d 86, 92, 568 N.E.2d 674. Circumstantial and direct evidence are of equal evidentiary value. *Jenks*, 61 Ohio St.3d at 272.

The state's theory of the case, as supported by evidence presented at the trial, was that Zack and Cindy George had a long-term sexual relationship, dating back to 1991. Zack, in fact, fathered a child with her, something apparently unknown to George's husband. By May 2001, the relationship was ending and Zack was becoming increasingly upset by that. Cindy George, on the other hand, was being harassed with hang-up telephone calls. Her husband thought Zack was responsible for the telephone calls. Telephone records from March through May 2001, established that hundreds of calls to Cindy George's telephone originated on Zack's telephone.

Sometime in the year 2000, Cindy George began a relationship, also sexual in nature, with Appellant. By April 2001, Appellant knew that Cindy George was being harassed. Sometime in the spring of 2001, Appellant got into a fight with Zack and beat him up. The harassing telephone calls to Cindy George continued.

In April or May 2001, Appellant purchased a weapon from a friend, and that weapon used bullets that were consistent with the size of the projectile found at the scene of the murder. Three weeks before the homicide, Cindy George gave Appellant $ 5,300 in cash to purchase a motorcycle. Three days before the murder, Appellant left a threatening telephone message n3 on Zack's telephone answering machine.

> n3 The message left by Appellant on Zack's answering machine was: "Okay, Jeff, you got one more out. I guess I'm going to have to call your parents in Phoenix. You better pick up the phone." According to Zack's wife, when he heard the message, he became upset and frantic.

Then two days after the murder, Appellant took the motorcycle to his ex-wife in Pennsylvania and left it there. He traveled in the dark of night and covered the neon green stripes on the motorcycle with duct tape to avoid notice.

13

The key question for the jury in this case was the identity of the person who rode the motorcycle towards the victim's automobile and fired the shot, killing him. The state sought to establish that Appellant was the assailant in several ways. First, they established that the motorcycle they were able to recover from Appellant's ex-wife was, in fact, the motorcycle purchased by Appellant just before the murder.

Next, they produced five individuals who witnessed the motorcycle and rider on the day of the murder. The witnesses all described the motorcycle as being dark, or green and black with some white. According to these witnesses, the motorcycle was consistent with the motorcycle that was admitted into evidence, which was a "ninja-type" motorcycle. The rider was described as wearing dark clothing and a dark helmet with a face-shield.

The defense sought to counter that evidence with three additional witnesses, none of whom successfully disputed the state's evidence on this point. The first defense witness described the motorcycle as black and white, but stated that there was sun glare reflecting off of it. Another said the motorcycle produced by the state was similar, except larger than the one she saw at the scene. It is not unreasonable to conclude that a motorcycle in a courtroom would appear to be different in size that one viewed at a distance.

The third witness described the motorcycle as being sour-apple green and cream in color and wing-like. She was certain that the motorcycle she saw at the scene was not the motorcycle placed in evidence, and she was similarly certain that Appellant was not the rider. However, this witness also described the rider as wearing brown casual dress shoes, brown socks, brown dress pants, silk brown jacket with an elastic waist, and an "ugly" rust-colored shirt underneath. Though she said he wore a black helmet with a grey shield, she could tell that he had no mustache, had brown eyes, looked Iranian - and was not Appellant. The witness was so specific in her description of the rider, even as to facial features under a shielded-helmet and the color of the rider's socks, that a jury might well doubt the credibility of her testimony or perhaps question whether she was looking at the same motorcycle and rider as the other witnesses. Upon review, the weight of the evidence therefore supports a conclusion that Appellant's motorcycle matched the motorcycle used by the assailant.

Furthermore, the timing of the purchase and disposal of the motorcycle, as well as the fact that Appellant made the trip to

14

Pennsylvania in the middle of the night, with duct-tape concealing green neon stripes on the motorcycle, was not satisfactorily explained by the defense. The jury, as well as this Court, are entitled to weigh this evidence and draw reasonable inferences from such behavior.

The state also presented evidence that Appellant and Cindy George had a relationship. This evidence came from friends who saw them together, were aware of their frequent telephone conversations, or heard Appellant refer to her as his girlfriend. It also came from neighbors who saw Cindy George frequently visit Appellant's apartment through 2001 and 2002. While the Georges had seven children, they also had a child-care provider who came to their home four days a week, permitting Cindy George to leave the home and she frequently did so. On August 5, 2000, Appellant listed Cindy Rohr (the maiden name of Cindy George ) as the emergency contact on his apartment rental application. Bank records establish that Cindy George paid Appellant's cell-telephone bills for March and April 2001.

In his statement to the police, Appellant denied having much of a relationship with Cindy George, describing her only as someone with whom he rode bikes. He also denied knowing anything about a relationship between Zack and Cindy George. The weight of the testimonial evidence as well as the documentary evidence demonstrating a close relationship between the Appellant and Cindy George leave Appellant's denials with little credibility.

Additional evidence of a developing plan between Appellant and Cindy George came in the form of telephone records from the relevant time periods. Those records establish that the two were in extensive contact both before and after the purchase of the motorcycle, before and after the murder, and while Appellant was disposing of the motorcycle in Pennsylvania.

Appellant did not openly admit involvement in the crime. However, in the spring of 2001, he did tell his ex-wife that he got into a fight with a "white-haired Israeli" and beat him up. Later, when his ex-wife saw a newspaper story about the murder with a picture of the white-haired victim, who was described as an Israeli paratrooper with dual citizenship, she asked him, "Was that you?" Appellant did not deny it, but answered: "Well, let's just say the guy's going to have a hard time parting his hair from now on."

For his part, in addition to attempting to dispute the evidence

15

describing the motorcycle, Appellant sought to establish that he could not have been at the scene of the homicide because he was at a friend's home in Canal Fulton, Ohio and then at a car show in Massillon, Ohio. The homicide was placed at 12:09 p.m. on June 16, 2001. Testimony established that it is a forty-minute drive from the scene of the crime to Canal Fulton. In his statement to the police, Appellant stated that he was at Mike Frasher's home in Canal Fulton at 10:00 that morning and spent the rest of the day at the car show with Mike Frasher, Randy Cole, and Robert Cole. Each of them testified at the trial.

Mike Frasher testified that Appellant arrived at his home in Canal Fulton, driving his automobile, dressed in jeans and a T-shirt, and behaving normally. Initially, Frasher stated that Appellant arrived at 12:30 p.m. or 12:45 p.m., and stayed 45 minutes to one hour. Upon consideration of telephone records during cross-examination, Frasher concluded that Appellant must have arrived after 12:56 p.m. Frasher further testified that he also saw Appellant at the car show about 6:00 p.m. or 7:00 p.m. that evening.

Robert Cole testified that he was with Appellant at the car show sometime between 1:00 p.m. and 3:00 p.m. Randy Cole stated that he received earlier telephone calls from Appellant, but did not see him at the car show until lunch time or a little after. He stated there was nothing out of the ordinary about Appellant that day.

Even if credited, the testimony of the defense witnesses does not establish that Appellant could not have been at the scene of the homicide when the murder took place. At best, it places Appellant in Canal Fulton approximately 45 minutes after the homicide. While this would require close-timing, based upon the testimony, it is possible.  Furthermore, the fact that the testimony of the defense witnesses is inconsistent with the statement of Appellant, serves to further weaken Appellant's position.

Appellant also attempted to suggest that other people had reason to kill Jeff Zack, but none of these reasons seem very reasonable or likely. For example, there was a dispute between Zack and a home-siding contractor who absconded with Zack's insurance money. Appellant suggests the contractor was therefore a potential murder suspect. In that situation, however, Zack would appear to be the wronged party, and the contractor would have no reason to seek revenge.

16

Appellant also showed that Zack's family was threatened by the owner of a brokerage firm when Zack cooperated with the authorities in an investigation of illegal operations by the firm. However, this investigation occurred twelve years ago and in California.

Last, Appellant pointed to a shattered sunroof window on an automobile Zack drove while visiting in Arizona. No one was certain, though, that the window was actually broken while Zack was driving the automobile.

Finally, Appellant questions why he and Cindy George would plot a murder to get rid of a man who "was out of the picture anyway?" While often relevant, motive is not an element of the crime of aggravated murder and it is not indispensable that motive be established. Some people act without a motive or with inconsistent motives, and others act with a hidden motive. In this case, the mere termination of Zack's affair with Cindy George does not necessarily eliminate any motive that may have previously existed. The parties stipulated, for example, that DNA testing established that Zack was the biological father of one of the children being raised by Ed and Cindy George.

Appellant has cited *United States v. Turner* (E.D.Mich.1979), 490 F. Supp. 583, for the proposition that, where the jury is presented with two sets of circumstantial evidence of relatively equal weight, with one pointing toward guilt and one pointing toward innocence, reasonable minds must then have a reasonable doubt as to the guilt of the evidence. However, this rule applies only in a "toss-up situation" where the evidence is equally consistent with a theory of innocence as with guilt. See, e.g., *United States v. Leal* (C.A.6, 1996), 75 F.3d 219, 223. We do not find the evidence in this case to be so.

After carefully reviewing the entire record, weighing all the evidence and reasonable inferences drawn therefrom, and considering the credibility of the witnesses, this Court cannot conclude that the jury clearly lost its way and created a manifest miscarriage of justice when it convicted Appellant of aggravated murder. Further, this Court has previously observed that "because sufficiency is required to take a case to the jury, a finding that a conviction is supported by the weight of the evidence must necessarily include a finding of sufficiency." (Emphasis omitted. ) *State v. Roberts* (Sept. 17, 1997 ), 1997 Ohio App. LEXIS 4255, 9th Dist. No. 96CA006462, at *5. Since we have already determined that Appellant's conviction was not against the manifest weight of the evidence, we must necessarily

17

> conclude that there was sufficient evidence to support the verdict in
> this case. Accordingly, Appellant's third and fourth assignments of
> error are not well taken.

The state appellate court found the evidence sufficient to prove the elements of the crimes charged.  In so doing, the state appellate ruling, which relied overall on state authorities, but it also applied analysis set forth in Jackson v. Virginia, supra, neither resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court, nor was the decision based upon an unreasonable determination of the facts in light of the evidence presented.  That being so, petitioner's third claim for relief must fail.

In his final claim for relief, submitted as an additional ground on June 1, 2006, petitioner argues that he was denied the effective assistance of trial and appellate counsel, by reason of "a joint defense agreement among the three [defense] attorneys and their clients[ ]" to "share in the discovery process and share information regarding their various trial tactics."

Respondent assert that this claim for relief has not been exhausted in the state courts and, in the alternative, that it lacks merit.

The exhaustion doctrine requires that before filing a petition in federal habeas corpus a defendant must utilize all available state remedies, through a motion or petition for review by the state's highest court, by which he/she may seek relief based upon an alleged violation of constitutional rights.  Granberry v. Greer, 481 U.S. 129, 133 (1987).  Under the exhaustion doctrine a petitioner must "fairly present" each federal constitutional claim to the state courts before seeking relief in federal court.  Baldwin v. Reese, 541 U.S. 27 (2004);  Hannah v. Conley, 49 F.3d 1193, 1196 (6th Cir. 1995).  In so doing, state courts are afforded "one full opportunity to resolve any

18

constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999). Fair presentation requires that a constitutional claim for relief be presented to the state's highest court. Id. at 845; Hafley v. Sowders, 902 F.2d 480, 483 (6th Cir. 1990); Klein v. Carter, Case No. 1:01CV0794, 2005 U.S. Dist. LEXIS 12571 (S.Dist.OH 2005).

An unexhausted claim may be considered under 28 U.S.C. §2254(b)(2) if the claim is found to be without merit and will not result in a grant of relief. Rockwell v. Yukins, 217 F.3d 421, 424 (6th Cir. 2000) ("In AEDPA, Congress similarly made clear that the only circumstance under which mixed petitions may be considered by a district court is where the court determines that the petition must be denied in its entirety.") See also, Jones v. Jones, 163 F.3d 285, 299 (5th Cir. 1998), cert. denied, 120 S.Ct. 224 (1999) (relief may be denied notwithstanding failure to exhaust state remedies); Nobles v. Johnson, 127 F.3d 409, 423 (5th Cir. 1997), cert. denied, 523 U.S. 1139 (1998); Hoxie v. Kerby, 108 F.3d 1239, 1242 (10th Cir.), cert. denied, 522 U.S. 844 (1997).

This Court agrees with the respondent that this claim for relief has not been presented to any state court, but may still be presented via a delayed petition for post-conviction relief pursuant to Ohio Revised Code §2953.21 et seq., and/or a delayed application to reopen direct appeal pursuant to Rule 26 of the Ohio Rules of Appellate Procedure.

That having been said, however, for each of the following reasons this Court is also of the opinion that petitioner's fourth claim for relief is without merit.

A petitioner claiming ineffective assistance of counsel must demonstrate that counsel's conduct was so far below acceptable standards of representation that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment to the United States Constitution, and that such

19

deficient performance so prejudiced the defense as to render the trial unfair.   Strickland v. Washington, 466 U.S. 668 (1984).   See also, United States v. Bavers, 787 F.2d 1022 (6th Cir. 1985). Disagreement by a defendant with tactics and/or strategy will not support a claim of ineffective assistance, and a petitioner in habeas corpus must overcome a presumption that challenged conduct of counsel was a matter of strategy, Strickland, 466 U.S. at 689.   Accord, Wilson v. Yukins, unreported, 1999 U.S.Dist. LEXIS 7644 (E.D.Mich. 1999).   "Judicial scrutiny of counsel's performance must be highly deferential."   Strickland, 466 U.S. at 689.

The prejudice prong of the test requires the following:

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.   A reasonable probability is a probability sufficient to overcome confidence in the outcome.

Id. at 694.   Stated differently, a reasonable probability could be shown by establishing that counsel's errors "caused the defendant to lose what he otherwise probably would have won."   United States v. Morrow, 977 F.2d 222 (6th Cir. 1992), cert. denied, 508 U.S. 975 (1993).

The Sixth Amendment right to effective assistance of counsel extends to appellate counsel on direct appeal of a criminal conviction.   Evitts v. Lucey, 469 U.S. 387 (1985).   The Sixth Circuit Court of Appeals has held that:

> In order to succeed on a claim of ineffective assistance of appellate counsel, a petitioner must show errors so serious that counsel was scarcely functioning as counsel at all and that those errors undermine the reliability of the defendant's convictions.   Strategic choices by counsel, while not necessarily those a federal judge in hindsight might make, do not rise to the level of a Sixth Amendment violation.

McMeans v. Brigano, 228 F.3d 674, 682 (6th Cir. 2000), cert. denied, 532 U.S. 958 (2001) (Citations omitted.)

Petitioner argues that he was denied the effective assistance of counsel by reason of the fact that his counsel at trial and on appeal entered into a joint defense agreement with attorney Michael Bowler, defense counsel for Ms. Cynthia George, his paramour and member of the love triangle that resulted in the victim's death.  Petitioner claims that he was unaware of any joint defense agreement. It is also important to note that Ms. George did not testify against him at his trial.

While petitioner was tried and convicted in 2003, Ms. George was charged in early 2005. It was during the trial of Ms. George that the prosecution moved to disqualify Ms. George's counsel, alleging that he could be called as a witness to testify that Ms. George paid petitioner's legal expenses and provided commissary money for him as "hush money" meant to dissuade petitioner from implicating Ms. George as a co-conspirator in the murder of Mr. Zack.  The defense argued that there was a "joint defense agreement" under which defense attorneys shared discovery materials and tactics, the existence of which would permit those attorneys to argue that confidential information obtained by way of the other attorney's client was privileged communication.  The prosecution disagreed, arguing that there was no such agreement but that even if there had been, transfers of funds would not be the type of confidential communication covered by the privilege under the joint defense doctrine.

The trial court ruled that there had been sufficient testimony of a joint defense agreement to share information and funds, and found no reason to disqualify Ms. George's counsel.  The court then held that as to whether Ms. George's intent in providing the funds to petitioner's counsel was evidence of a conspiracy or evidence of a joint defense, would be left for the jury to decide.[2]

In arguing that he was denied the effective assistance of counsel, petitioner offers nothing

---

[2]Ms. George was ultimately found guilty of complicity to commit aggravated murder.

21

more than the mere existence of the agreement among the defense attorneys to share information and funds as supporting his claim of ineffective assistance, without any explanation as to how his defense was compromised, as opposed to bolstered, by such an agreement.  A common defense strategy under the circumstances of this case prevented these defendants from inculpating each other and helped pay for petitioner's legal expenses.  There is no indication that the outcome of his trial would have differed if there had not been such an agreement.  That being so, this theory of ineffective assistance of counsel could not prevail and, therefore, need not be exhausted.

In light of all the foregoing, it is recommended that the petition be dismissed without further proceedings.


s/DAVID S. PERELMAN
United States Magistrate Judge


DATE:   July 27, 2006


## OBJECTIONS

Any objections to this Report and Recommended Decision must be filed with the Clerk of Courts within ten (10) days of receipt of this notice.  Failure to file objections within the specified time waives the right to appeal the District Court's order.  *See, United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See, also, Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).

22